**CIBA–GEIGY CORPORATION, Plaintiff,**

v.

**BOLAR PHARMACEUTICAL CO.,
INC., Defendant.**

Civ. A. No. 82–788.

United States District Court,
D. New Jersey.

Aug. 11, 1982.

Pitney, Hardin, Kipp & Szuch by Frederick L. Whitmer, Morristown, N. J., Kaye, Scholer, Fierman, Hays & Handler by Randolph S. Sherman, New York City, for plaintiff.

Bendit, Weinstock & Sharbaugh by James F. Keegan, West Orange, N. J., Fitch, Even, Tabin, Flannery & Welsh by Robert B. Jones, Chicago, Ill., for defendant.

## OPINION

SAROKIN, District Judge.

## INTRODUCTION

Although the battle over "look-alike" drugs raises difficult legal issues, the reali-

ties of these repeated skirmishes should not be ignored. The brand name companies have spent years and substantial monies in developing and promoting their product. They not only create the drug but establish a market for it. By virtue of their advertising campaigns, doctors become aware of the drug and its benefits and are encouraged to prescribe it.

The generic "look-alike" drug enters the marketplace with a substantial advantage. The predecessor manufacturer has performed the necessary research and development and has created the market. Therefore, the generic drug can be produced and sold at a much lower cost. The "look-alike" drug becomes more saleable, because it makes it easier for both the doctor and pharmacist to substitute the generic drug. A patient who has utilized the brand name drug over a period of time may accept the generic drug more readily if it looks the same as the brand name. The patient may resist such substitution, if it does not. Most often that anxiety can be dispelled by a simple explanation by the physician or pharmacist regarding the substitution of a generic drug with a different appearance.

On the other hand, the brand name manufacturer contends that the identity of appearance facilitates negligent and intentional substitution without authorization from either the doctor or the patient. To permit the generic drug to copy the appearance of the brand name product increases sales by the generic manufacturer and erodes those of the brand name manufacturer. Although both seek to rest their cause on the public good, it is profit and the desire to earn it which is at the core of this dispute. The generic manufacturer wishes to benefit from the efforts and expense of the brand name manufacturer. The latter wishes to prevent and prohibit such intrusion and retain the benefits for itself.

With this general introduction the court will consider the specific factual and legal issues presented by this matter.

## PROCEDURAL HISTORY

Plaintiff CIBA–GEIGY Corporation ("CIBA–GEIGY") commenced this action on March 12, 1982, alleging that defendant Bolar Pharmaceutical Co., Inc. ("Bolar") had violated both the federal and state law of unfair competition by intentionally duplicating the physical appearance (i.e., trade dress) of CIBA–GEIGY's brand name prescription drug APRESAZIDE.® On March 17, 1982, following notice to Bolar, the defendant was temporarily restrained from selling its generic versions of the products in suit in trade dress confusingly similar to that of CIBA–GEIGY's APRESAZIDE products and Bolar was ordered to show cause on March 22, 1982, why such conduct should not be preliminarily enjoined.

Bolar then moved to dismiss the complaint for lack of personal jurisdiction and improper venue. On March 22, 1982, in order to permit development of the jurisdictional facts relative to Bolar's New Jersey contacts and to enable both parties to conduct discovery attendant to CIBA–GEIGY's preliminary injunction motion, the court adjourned the hearing until April 22, 1982 and, with Bolar's consent, continued the temporary restraining order until that date. On April 21, 1982, Bolar advised the court that it was withdrawing its motions.[1]

Evidence with respect to the preliminary injunction motion was taken on April 22, May 12 and June 15, 1982.[2] CIBA–GEIGY called three witnesses as part of its affirmative case and two rebuttal witnesses; in addition, plaintiff introduced numerous exhibits into evidence, including designated portions of two depositions. Bolar called three witnesses as part of its defense and

---

1. CIBA–GEIGY seeks its costs, including attorney's fees, for defending against Bolar's motions on the ground that they were baseless when made and interposed solely for purposes of vexation. Consideration of that application has been deferred pending resolution of the preliminary injunction motion.

2. Neither party consented under Rule 65(a)(2) of the Federal Rules of Civil Procedure to advance and consolidate the trial on the merits with the hearing on CIBA–GEIGY's preliminary injunction.

introduced numerous exhibits into evidence. As to all exhibits accepted into evidence, the court reserved ruling on relevancy objections pending review of the parties' post-hearing submissions, and repeatedly observed that its determination would be based only upon relevant and material evidence.[3]

The temporary restraining order was continued through the May 12 hearing upon Bolar's consent. Thereafter, upon good cause shown, the court continued the order over Bolar's objection.

The following findings of fact and conclusions of law are based upon a careful review of the entire record, an appraisal of the witnesses' credibility and demeanor and the reasonable inferences to be drawn therefrom, and the proposed findings of fact and conclusions of law submitted by both parties.

## FINDINGS OF FACT

### A. *The Parties*

CIBA–GEIGY, a New York corporation with a principal place of business in Summit, New Jersey, is engaged, among other things, in the research, development, manufacture and sale of prescription pharmaceutical products, and in particular the research and development of new prescription drugs for the treatment of hypertension (commonly referred to as high blood pressure). CIBA–GEIGY devoted a significant portion of its annual research and development budget to research specifically directed at the treatment of hypertension.

CIBA–GEIGY markets brand name pharmaceutical products through two separate divisions, the CIBA Pharmaceutical Company and GEIGY Pharmaceuticals, each having responsibility for the marketing and sale of its own product line. The CIBA Pharmaceutical Company currently markets approximately forty-one prescription pharmaceuticals, ten of which are prescribed for

the treatment of hypertension (*i.e.*, anti-hypertensives). The promotion of these products is carried on throughout the United States through a network of some 400 CIBA sales representatives, thirty eight district sales managers, and six regional sales managers. The sales representatives, also known as detail men, personally call upon physicians, retail pharmacists and hospital pharmacies to promote the CIBA line of products through the use of written brochures, reminder or "leave" items (such as pens, rulers and scratch pads) and free drug samples. CIBA–GEIGY does not generally advertise its prescription products directly to the consumer.

Bolar, a New York corporation with its principal place of business in Copiague, New York, is what is known in the pharmaceutical industry as a generic drug manufacturer; that is, it makes and markets under generic names, prescription pharmaceuticals which duplicate the active ingredients of products already researched, developed and sold under brand name by companies such as CIBA–GEIGY. Because their research, development and clinical expenses are generally much less than those of brand name companies, generic drug manufacturers are usually able to sell their products at prices lower than their brand name counterparts.[4]

Bolar markets its generic pharmaceuticals directly to approximately 400 active customers throughout the United States. These customers are comprised of private label distributors, drug wholesalers and distributors, and federal government agencies. Bolar does not sell its products directly to retail pharmacies; rather, pharmacies purchase Bolar's products through drug wholesalers and distributors which, in turn, buy directly from Bolar. Nor does Bolar promote its generic products directly to physicians and pharmacists, as does CIBA–GEIGY. It is primarily the promotional effort

---

**3.** The opinion of the court conforms to that understanding.

**4.** In the case of the product in suit, Bolar and CIBA–GEIGY each obtained approval from the

Food and Drug Administration by the same Abbreviated Drug Application (ANDA) Procedure [21 C.F.R. 314.1(f)].

by brand name companies which creates the demand for new prescription drugs.

### B. *CIBA–GEIGY's APRESAZIDE Products*

In 1959, CIBA–GEIGY, with the approval of the Food and Drug Administration ("FDA"), began manufacturing and selling a combination prescription drug under the registered trademark APRESOLINE–ESIDRIX for the treatment of hypertension. CIBA–GEIGY's APRESOLINE–ESIDRIX product, which it makes and markets in orange, dry-coated tablets, contains two active ingredients: hydralazine hydrochloride and hydrochlorothiazide, in a fixed ratio of 25 mg. to 15 mg. per tablet.

Two factors often responsible for hypertension are vasoconstriction (i.e., constriction of the blood vessels) and excessive fluid volume. Hydrochlorothiazide is a diuretic which reduces excess sodium and fluid volume. However, because hydrochlorothiazide basically treats only the excessive fluid problem, it often proves therapeutically inadequate once hypertension has progressed beyond its milder forms. Hydralazine hydrochloride is a vasodilator which treats vasoconstriction by directly relaxing and dilating arterioles, thereby decreasing peripheral resistance. By combining hydralazine hydrochloride and hydrochlorothiazide, both factors can be treated in a single product. In obtaining FDA approval to market its APRESOLINE–ESIDRIX product, CIBA–GEIGY became the first drug manufacturer to establish the safety and efficacy of a fixed combination of hydralazine hydrochloride and hydrochlorothiazide for the treatment of hypertension. Subsequent to CIBA–GEIGY's introduction of its APRESOLINE–ESIDRIX product, other drug companies, including Bolar, began selling a combination of 25 mg. of hydralazine hydrochloride and 15 mg. of hydrochlorothiazide in tablet form.

In 1974, faced with the possible market withdrawal or decreased sales of its leading anti-hypertensive product SER–AP–Es, due to an alleged link between one of its active ingredients, reserpine, and breast cancer, CIBA–GEIGY determined that hydralazine hydrochloride, alone and in combination with hydrochlorothiazide, offered the company "the greatest promotional opportunity in a non-reserpine antihypertensive market." In the fall of 1974 CIBA–GEIGY commenced developmental efforts ultimately to bring to market dosage strengths of hydralazine hydrochloride and hydrochlorothiazide in fixed combination ratios of 25 mg./25 mg., 50 mg./50 mg. and 100 mg./50 mg.

In September 1974, CIBA–GEIGY determined, for marketing reasons, that these new combination ratios of hydralazine hydrochloride and hydrochlorothiazide should be made and sold in capsule rather than tablet form. The selection of these products' trade dress was made in order to distinguish the new products from CIBA's other hydralazine-containing products then on the market, all of which, including the APRESOLINE–ESIDRIX product, were being sold in tablet form. There was no medical, pharmaceutical or manufacturing reason which compelled CIBA–GEIGY to make the new combinations in capsule rather than tablet form.

CIBA–GEIGY also selected the capsule colors for its new hydralazine hydrochloride/hydrochlorothiazide formulations in September 1974. The initial recommendations were made by Mr. John S. Marmaras, CIBA Pharmaceutical's Design Director at the time. Mr. Marmaras chose color combinations which were "pleasing" to his eye, and then recommended them to CIBA's Marketing Department for Mr. Barnes' ultimate approval. Two criteria were used in making the ultimate selection: first, the capsule colors should not duplicate those of any other currently marketed major pharmaceutical product; and, second, they should not be displeasing to the eye. The capsule colors which were selected were those in which CIBA–GEIGY eventually marketed its new hydralazine hydrochloride/hydrochlorothiazide combinations under the brand name APRESAZIDE: (a) blue and white opaque combination capsules containing 25 mg. of hydralazine hydrochlo-

ride and 25 mg. of hydrochlorothiazide; (b) pink and white opaque capsules containing 50 mg. of hydralazine hydrochloride and 50 mg. of hydrochlorothiazide; and (c) pink flesh and white opaque capsules containing 100 mg. of hydralazine hydrochloride and 50 mg. of hydrochlorothiazide. As in the case of capsule selection, CIBA–GEIGY arbitrarily selected these color combinations based solely on marketing considerations; there was no medical, pharmaceutical or manufacturing reason which compelled the selection of these particular capsule colors.

On May 26, 1976, CIBA–GEIGY obtained FDA approval in the form of an approved Abbreviated New Drug Application ("ANDA") to market its new hydralazine hydrochloride/hydrochlorothiazide combinations. Thereafter, in October 1976, CIBA–GEIGY began to sell these combination products under the brand name APRESAZIDE for the treatment of hypertension. On February 15, 1977, CIBA–GEIGY was granted a federal registration for the trademark APRESAZIDE; and on March 9, 1982, CIBA–GEIGY filed a declaration under Sections 8 and 15 of the Lanham Act (15 U.S.C. §§ 1058, 1065) with the Commissioner of Patents and Trademarks.

Since October 1976, CIBA–GEIGY has continuously marketed its APRESAZIDE products in the same trade dress, and for over five years, from October 1976 to March 1982, it was the sole pharmaceutical company which marketed these combination products in the particular trade dress described.[5]

From October 1976 to date, CIBA–GEIGY, through its CIBA Pharmaceutical Company division, has spent and continues to spend substantial sums of money advertising and promoting its APRESAZIDE products to physicians, pharmacists and hospitals. During the period October 1976 through 1981, CIBA–GEIGY's expenditures for the distribution of free samples and for promotional and medical literature, films, symposia and seminars promoting its APRESAZIDE products were in excess of $9 million. In addition, during this same period, the cost attributable to the efforts of the CIBA Pharmaceutical Company sales force in promoting APRESAZIDE products was over $16 million.

Since October 1976, CIBA–GEIGY's promotional literature for its APRESAZIDE products, including detailing folders and reminder or "leave" items, has routinely featured the capsules' physical appearance in pictures as well as described them in words. In addition, CIBA–GEIGY has promoted its APRESAZIDE products by distributing free sample capsules to physicians.

CIBA–GEIGY's sales of these combinations have increased steadily and substantially since their market introduction in October 1976. From that time through 1981, CIBA–GEIGY's total annual dollar sales of its APRESAZIDE products increased as follows:

| | |
|---|---|
| 1976 (Oct.—Dec.) | $1.1 million |
| 1977 | $3.4 million |
| 1978 | $5.3 million |
| 1979 | $8.3 million |
| 1980 | $11.2 million |
| 1981 | $14.3 million |

CIBA–GEIGY projects that in 1982 its APRESAZIDE sales will rise to approximately $17 million.

Similarly, from October 1976 through 1981, CIBA–GEIGY's annual APRESAZIDE sales in terms of capsules increased as follows:

| | Blue & White 25 mg./25 mg. | Pink & White 50 mg./50 mg. | Pink Flesh & White 100 mg./50 mg. |
|---|---|---|---|
| 1976 (Oct.–Dec.) | 7,441,000 | 4,645,500 | 1,076,000 |
| 1977 | 34,480,800 | 9,611,100 | 945,100 |
| 1978 | 50,013,500 | 14,059,100 | 1,354,800 |

5. Until February 1982, CIBA–GEIGY was the only pharmaceutical manufacturer with FDA approval to market these particular combinations of hydralazine hydrochloride/hydrochlorothiazide at all, regardless of trade dress.

|      | Blue & White 25 mg./25 mg. | Pink & White 50 mg./50 mg. | Pink Flesh & White 100 mg./50 mg. |
|------|------------|------------|------------------|
| 1979 | 70,706,100 | 19,363,900 | 1,699,800 |
| 1980 | 83,019,400 | 22,310,400 | 1,838,500 |
| 1981 | 90,939,700 | 23,673,600 | 1,946,100 |

Bolar's decision to market generic versions of the APRESAZIDE combinations was based, at least in part, on the commercial success that CIBA–GEIGY had achieved with those products.

From October 1976 through 1981, the number of patients taking APRESAZIDE products for hypertension also increased steadily.

As a result of their commercial success, CIBA–GEIGY's APRESAZIDE products have become the third largest seller in the CIBA Pharmaceutical line of ten anti-hypertensive products and the fifth largest seller in the entire CIBA Pharmaceutical line of forty-one prescription products.

As a result of CIBA–GEIGY's long, continuous and exclusive use of the trade dress for its APRESAZIDE products, its extensive promotional efforts and the commercial success that its APRESAZIDE products have achieved, physicians who regularly prescribe APRESAZIDE products have come to associate the trade dress of those capsules with the brand name APRESAZIDE as representing a single source of supply. Moreover, because anti-hypertensive drugs are usually taken on a daily basis for an extended period of time and because the medication's name is routinely typed or written by the pharmacist on the patient's vial, many patients taking APRESAZIDE products have come to associate the trade dress of those capsules with the brand name APRESAZIDE as representing a single source of supply although not with the particular manufacturer.

### C. Bolar's Look-Alike Products

On March 4, 1982, Bolar received FDA approval in the form of an approved ANDA to market combination products containing hydralazine hydrochloride and hydrochlorothiazide in the same fixed ratios as CIBA–GEIGY's APRESAZIDE products. The ANDA's approved labeling indicated that Bolar intended to market these combinations in the same colors, sizes and shapes as CIBA–GEIGY's APRESAZIDE capsules.

Although Bolar claims that it selected its colors for reasons of public safety and public recognition, the court finds that Bolar deliberately copied the trade dress of CIBA–GEIGY's APRESAZIDE capsules for its own economic advantage.

Bolar claims that it copied the trade dress of CIBA–GEIGY's APRESAZIDE products in order to prevent injury and confusion on the part of patients who it claims identify the trade dress of their medications with the particular medical conditions for which they are prescribed. Wholesale and distributor customers would prefer Bolar to duplicate the trade dress of CIBA–GEIGY's APRESAZIDE products because doing so will facilitate generic substitution and thus increase the sales of Bolar's products. Patients are more apt to accept generic substitutions if the medication has the same appearance. They may reject such substitution if it does not. The court specifically finds that Bolar's principal motivation in deliberately copying APRESAZIDE's trade dress was to increase sales of its hydralazine hydrochloride/hydrochlorothiazide combinations at the expense of CIBA–GEIGY's APRESAZIDE products.

### D. Likelihood of Confusion

Bolar contends that the imprintation of its corporate logo and NDC Code Number on each of its hydralazine hydrochloride/hydrochlorothiazide capsules sufficiently distinguishes them from CIBA–GEIGY's APRESAZIDE capsules so as to obviate any likelihood of confusion among patients.

Realistically, the likelihood of confusion cannot be assessed by a side-by-side comparison of the plaintiff's and defendant's products. It is the overall physical appearance of defendant's trade dress which is critical. The vast majority of patients who take this type of medication do not or cannot identify their medication, or its source, by reference to the matter imprinted on the drug capsule or tablet. Most of such patients are over the age of 60 years and it is unlikely that they will have sufficiently acute eyesight to detect the difference between their usual medication and Bolar's products based on the imprintations on Bolar's capsules.

Furthermore, Bolar's contention is contrary to its assertion that such duplication will obviate patient resistance to lawful generic substitution. Indeed if patients would be able to distinguish the source by markings on the capsule itself, it is difficult to reconcile that contention with the claim that copying of the characteristics facilitates lawful substitution. On the one hand defendant asserts that copying reduces resistance because the patient will think he or she is receiving the same medication. On the other hand and quite inconsistently, defendant contends that the medications can be readily distinguished by examination of the capsule. The fact is that they cannot be so distinguished by the typical patient utilizing such medication.

E. *Nonfunctionality of APRESAZIDE's Trade Dress*

There was no medical, pharmaceutical or manufacturing reason which compelled Bolar to make its hydralazine hydrochloride/hydrochlorothiazide combinations in capsule rather than tablet form or in the same color combinations as CIBA–GEIGY's APRESAZIDE products. CIBA–GEIGY's APRESOLINE–ESIDRIX product, containing 25 mg. of hydralazine hydrochloride and 15 mg. of hydrochlorothiazide, is made in tablet form, as is Bolar's generic version of this product. CIBA–GEIGY actually formulated and manufactured production batches of the products at issue here in tablet form.

Another drug manufacturer, Reid-Provident Laboratories, Inc. ("Reid-Provident"), is marketing its products in distinctively different colored capsules than APRESAZIDE and has been successfully marketing its green-colored capsules as generic alternatives to CIBA–GEIGY's APRESAZIDE products.

Since the commencement of this action, Bolar itself has been marketing the fixed combinations in suit in distinctly different colored capsules than CIBA–GEIGY's APRESAZIDE products; and Bolar admits that such sales will be profitable. However, such action may have resulted from the temporary restraining order in this matter. Accordingly, the court does not view it as appropriate to utilize such sales in determining this matter, since the alternative may have been necessitated by compulsion.

The FDA has taken the official position that "the appearance of drug products is [not] closely enough related to their safety and effectiveness that the Agency can, on the basis of its present experience, require that generic drug products duplicate the appearance of their innovator drug counterparts." Although the FDA has routinely approved new drug applications and abbreviated new drug applications for drug products that duplicate the color, size and shape of the innovator's product, it has declined to *require* such duplication and "has not taken action affirmatively to encourage similarity in appearance between innovator products and their generic versions."

The official position of the New Jersey Drug Formulary is that a drug's trade dress serves no therapeutic function. Thus, in a section addressed "To the Consumer," the Formulary states:

You should understand that generic products often differ in color, shape or size from the better-known (and usually more expensive) brand name products. Such differences are to be expected; these differences do *not* affect how well the medication works.

The court specifically rejects the contentions by Bolar that CIBA–GEIGY's trade

dress is functional because it distinguishes between strengths; or because it may be used for preliminary identification in overdose or poison incidents; or because it may be a secondary means of identification by pharmacists.

Bolar's principal functionality contention is that patients with chronic illnesses such as hypertension identify the trade dress of their medications with the medical condition for which they are prescribed and that, accordingly, it is necessary for generic equivalents to duplicate the physical appearance of their brand name counterparts in order to prevent patient confusion and anxiety where legal generic substitution occurs.[6]

This resistance or anxiety theory has no application in cases where a patient is prescribed a particular medication for the first time and his pharmacist lawfully dispenses the generic equivalent. In such instances, even if the generic equivalent looks different than its brand name counterpart, the patient will neither be confused nor anxious since he or she has never been exposed to the brand name product's trade dress. To the extent that the patient in such circumstances identifies his medication's physical appearance with the condition for which it has been prescribed, he or she will do so by reference to the generic equivalent's trade dress.

Similarly such theory has no application in cases where a patient who is already on a brand-name drug is given the opportunity to switch to a generic equivalent but declines to do so. In these situations, which concededly occur and are consistent with the patient's right to exercise informed consent, the physician or pharmacist will honor the patient's preference and continue the patient on the brand-name product. Thus, there is no occasion for confusion or anxiety under these circumstances based on differences in trade dress because the patient is never dispensed the generic equivalent, and therefore no anxiety or resistance can develop.

Accordingly, the theory is applicable only to those cases in which generic substitution is authorized, and a patient already on a brand name product is then dispensed a different-looking generic equivalent. In this situation, the patient will usually call his physician or pharmacist to inquire whether the correct medication has been dispensed. However, the two physicians who testified at the hearing, Dr. Audrey G. Kriegman of CIBA–GEIGY and Dr. Herbert Silberner, Bolar's own expert, both agreed that as soon as the situation is explained to the patient (which is standard medical and pharmacy practice) the patient invariably accepts the explanation and his temporary anxiety is immediately dissipated.

If the fears and anxieties of the patient could not be quelled by such an explanation, it may well be that a finding of functionality would be mandated. For this reason, the court made specific inquiry of Bolar's expert on this very subject:

THE COURT: ... [S]uppose, for instance, the generic equivalent was a different size, color and shape than a brand name drug; what difference would that make?

THE WITNESS: The difference would be primarily if he were to change from one drug to another. In other words, if the brand name were one size, shape and color and the generic were another, when he made the transformation from the brand name to the generic there would be an element of con[f]usion.

THE COURT: But that could be remedied, could it not, by your explaining to the patient that he or she was receiving the generic equivalent.

THE WITNESS: That is exactly what we have to do, yes, sir.

THE COURT: And has that, in your experience, satisfied the patient's hesitancy?

THE WITNESS: Once the patient has been explained, they will accept the dif-

---

**6.** The court has already noted the inconsistency of this position with the claim that Bolar's

product is readily distinguishable by virtue of its own markings on the capsule.

ference size, shape and color. But it requires an explanation.

In order to exercise informed consent to generic substitution, a patient is entitled to know in advance whether the generic equivalent is made by a different drug manufacturer than the brand name counterpart he has been taking.[7]

Bolar's entire theory rests on the improper assumption that the patient will develop resistance or anxiety upon receiving a different looking pill than that which had previously been prescribed. That assumption does not accord with the facts or with the law in many states. As a matter of practice or requirement, either the physician or the pharmacist will advise the patient of the proposed generic substitution in advance. It would be a simple matter to advise the patient at that time that the medication may be different in appearance. Such procedure could assuage the patient before ever examining the medication and recognizing the change in appearance. The same result is accomplished if the difference in appearance is discovered for the first time after the generic drug is dispensed and the explanation follows rather than precedes receipt of the medication. The right of informed consent will be jeopardized if the generic equivalent looks identical or confusingly similar to the brand name drug, since Bolar's theory necessarily assumes that in such circumstances the patient will not be alerted to any difference in the two products.

Permitting generic drug manufacturers to sell identical copies of medication may deprive patients of the right to make such inquiry because they will be deprived of the opportunity to be informed of the facts (i.e. the difference in appearance) sufficient to warrant such inquiry. Therefore, the court rejects Bolar's functionality argument as being unsupported by the record and contradicted by the testimony of its own expert witnesses.

### F. Secondary Meaning

Applying the well-settled legal criteria for determining secondary meaning to the court's foregoing fact findings concerning (a) the extended, continuous and exclusive use by CIBA–GEIGY of APRESAZIDE's trade dress; (b) the extensive and costly activities of CIBA–GEIGY in promoting its APRESAZIDE products and their distinctive and arbitrary trade dress; (c) the commercial success that CIBA–GEIGY's APRESAZIDE products have achieved in the market place; and (d) Bolar's intentional copying of APRESAZIDE's trade dress and the motivation for that copying, the court finds that CIBA–GEIGY has demonstrated a strong likelihood of ultimate success.

Bolar has advanced several arguments in opposition to CIBA–GEIGY's assertion that the trade dress of its APRESAZIDE products has acquired secondary meaning: *first,* that the mere existence of other blue and white, pink and white and pink flesh and white capsules on the market, albeit for non-antihypertensives and regardless of their sizes, shapes and shades, precludes a finding of secondary meaning in APRESAZIDE's trade dress; *second,* that in September 1974, CIBA–GEIGY allegedly copied the trade dress of Pfizer's yet to be marketed MINIPRESS products, at least for the blue and white 25 mg./25 mg. and the pink and white 50 mg./50 mg. APRESAZIDE capsules; *third,* that even if CIBA–GEIGY did not copy MINIPRESS's trade dress, the prior market presence of Pfizer's blue and white 5 mg. and pink and white 2 mg. of MINIPRESS capsules, which are anti-hypertensives, precludes a finding of secondary meaning in the trade dress of CIBA–GEIGY's 25 mg./25 mg. and 50 mg./50 mg. products; and *fourth,* that APRESAZIDE has become the common, descriptive name for all combinations of hydralazine hydrochloride and hydrochlorothiazide in the same fixed ratios as the products in suit or, alternatively, that CIBA–GEIGY has abandoned its federally-registered APRESAZIDE trademark.

---

7. The Illinois Formulary specifically provides that drug substitution may not occur unless,

inter alia, the "informed" patient agrees to the substitution.

1. *The Existence of Non-Antihypertensives Having the Same General Color Scheme as APRESAZIDE Capsules.*

Dr. O'Donnell conducted a survey of drug literature for Bolar, in the course of which he identified about fifty drug products appearing in blue and white capsules, about eight to ten appearing in pink and white capsules, and approximately two appearing in pink flesh and white. Bolar introduced only certain of these capsules into evidence at the hearing. While accepting their admission into evidence over the objection of CIBA–GEIGY's counsel, the court stated at the time that it was dubious about their probative significance. The court finds that these exhibits and the survey are irrelevant to the issues before the court and, hence, are entitled to no weight on this motion except for the MINIPRESS capsules, which shall be discussed hereafter. All other capsules clearly involve the proverbial comparison of "apples and oranges." Firstly, many of the identified capsules were either distinctly different shades of blue or pink or distinctly different sizes than CIBA–GEIGY's APRESAZIDE capsules. Secondly, Dr. O'Donnell admitted that not one of the ten exhibits contained active ingredients which were chemically, generically or pharmaceutically equivalent to those of APRESAZIDE products; and that, in fact, unlike APRESAZIDE products, not one of these exhibits was a product indicated for the treatment of hypertension. Indeed, two of the products (Anacin-3 and Extra Strength Bufferin) are not even prescription drugs. None of these products could legally be substituted for APRESAZIDE products, even when the physician's prescription permits substitution.

2. *CIBA–GEIGY's Alleged Copying of MINIPRESS's Trade Dress*

Pfizer's MINIPRESS product is a prescription drug indicated for the treatment of hypertension which contains a single active ingredient, prazosin hydrochloride. MINIPRESS is marketed in a 1 mg. all-white capsule, a 2 mg. pink and white capsule, and a 5 mg. blue and white capsule. (D–1, D–2, D–12A). Bolar contends that in selecting the trade dress for its 25 mg./25 mg. and 50 mg./50 mg. APRESAZIDE products, CIBA–GEIGY deliberately copied the trade dress of Pfizer's 5 mg. and 2 mg. MINIPRESS products, thus negating a finding of secondary meaning. Although there is substantial evidence that CIBA–GEIGY carefully followed, investigated and monitored Pfizer's progress with said product, there is no evidence that CIBA–GEIGY deliberately copied the trade dress of any of Pfizer's capsules for MINIPRESS.

CIBA–GEIGY selected the capsule form and colors for its APRESAZIDE products in September 1974, two years before its products were actually marketed. In September 1974 Pfizer's MINIPRESS products were not yet on the market, being in the developmental stage about two years away from their commercial introduction in the United States. Accordingly, in order for Bolar's copying theory to succeed, there must be credible record evidence that Pfizer selected the trade dress for its 5 mg. and 2 mg. MINIPRESS products prior to CIBA–GEIGY's selection in September 1974, and that those responsible for the choice of APRESAZIDE's trade dress knew or had reason to know the form and colors in which the MINIPRESS products would ultimately be marketed. The record is barren of any such evidence.[8]

Apart from the fact that there is no proof of when Pfizer actually selected the final trade dress for its MINIPRESS products, the two CIBA–GEIGY officials responsible for the selection of APRESAZIDE's trade dress, Mr. Barnes and Mr. Marmaras, denied that they even knew in September 1974, the trade dress in which Pfizer would

---

**8.** Bolar has offered no plausible theory as to why CIBA–GEIGY, a brand name drug manufacturer, would have wanted to copy the trade dress of another brand name company's products even before those products had established any acceptance in the marketplace. Bolar contends that it has been deprived of discovery on this issue and that any similarity could not occur by chance. However, the court cannot substitute speculation for the uncontradicted testimony of plaintiff's witnesses.

ultimately market MINIPRESS, much less that they copied that trade dress. There is no proof that CIBA–GEIGY had advance knowledge of the colors of Pfizer's MINIPRESS capsules as early as September 1974 or at any time before they were actually marketed.

In September 1974, CIBA–GEIGY did undertake to bring its APRESAZIDE products to the market on an "urgen[t]" basis. The urgency behind the APRESAZIDE project in 1974 was CIBA–GEIGY's concern that its leading anti-hypertensive product, SER–AP–ES, might be withdrawn from the market or lose substantial sales because of an alleged link between one of its components, reserpine, and breast cancer. But even if the urgency was to race Pfizer to the marketplace, such circumstances do not warrant a finding of deliberate copying by CIBA–GEIGY.

### 3. *The Market Presence of the Blue and White and Pink and White MINIPRESS Products*

Bolar also contends that the market presence of Pfizer's 5 mg. blue and white and 2 mg. pink and white MINIPRESS capsules, which started two months before APRESAZIDE's introduction in October 1976, precludes a finding of secondary meaning in the 25 mg./25 mg. and 50 mg./50 mg. APRESAZIDE capsules.

It is the overall appearance of MINIPRESS's trade dress that is critical for the resolution of this matter. Pfizer's 5 mg. blue and white MINIPRESS capsules are not similar in overall appearance to CIBA–GEIGY's 25 mg./25 mg. blue and white APRESAZIDE capsules. (Compare D–2 with P–2). Pfizer's blue and white capsules are noticeably larger than the CIBA–GEIGY blue and white capsules. Of course, such differences may not be readily apparent, because, as indicated above, a patient does not make a side-by-side comparison.

Insofar as the pink and white capsules are concerned, while the overall appearance of the Pfizer and the CIBA–GEIGY products are similar and while they are both anti-hypertensive, there is no real likelihood of patient confusion between the two. MINIPRESS contains a single active ingredient (prazosin hydrochloride) which is chemically, pharmaceutically and generically different than APRESAZIDE's two active ingredients (hydralazine hydrochloride and hydrochlorothiazide); moreover, MINIPRESS has no diuretic component while APRESAZIDE combines a thiazide diuretic with a direct-acting vasodilator. For this reason, no pharmacist could lawfully substitute MINIPRESS for APRESAZIDE, even if a physician's prescription allows substitution. Moreover, there is no reason to believe that a pharmacist would illegally substitute MINIPRESS for APRESAZIDE since they are comparable in price, thus removing the economic incentive for such conduct.

The similarity between APRESAZIDE and MINIPRESS does not preclude the trade dress of APRESAZIDE from acquiring secondary meaning. The trade dresses of APRESAZIDE and MINIPRESS products can both simultaneously achieve secondary meaning among two distinctly different groups of patients, APRESAZIDE users on the one hand, and MINIPRESS users on the other.

### 4. *Bolar's Claim that CIBA–GEIGY's APRESAZIDE Trademark has Become Generic or has been Abandoned*

Bolar itself has never used APRESAZIDE as the common descriptive name for its generic combinations of hydralazine hydrochloride and hydrochlorothiazide. On the contrary, Bolar has consistently recognized that hydralazine hydrochloride/hydrochlorothiazide is the common generic name for such products and has consistently used it as such. The record establishes that hydralazine hydrochloride/hydrochlorothiazide is the commonly recognized generic name for the products in suit, and that it has been "useful" enough for Bolar itself to utilize it as such. Moreover, CIBA–GEIGY itself has uniformly included hydralazine hydrochloride/hydrochlorothiazide as the established generic name for its APRESAZIDE branded products in all of its promo-

tional literature disseminated outside of the company.

Equally unsupported is Bolar's claim of trademark abandonment by CIBA–GEI-GY's alleged failure "to use the name APRESAZIDE in accordance with its corporate policy for maintenance and protection of its trademarks ...." The court has reviewed CIBA–GEIGY's corporate trademark protection policy as set forth in Exhibit D–4 and concludes that there is no evidence in the record which would indicate a material departure from this policy in the case of CIBA–GEIGY's APRESAZIDE trademark.

Bolar has introduced no evidence that CIBA–GEIGY either committed any acts of abandonment or had an actual intent to abandon its APRESAZIDE trademark.

### G. Bolar's Intent to Induce Illegal Substitution

Bolar's principal motivation in deliberately copying APRESAZIDE's trade dress was to increase sales of its hydralazine hydrochloride/hydrochlorothiazide products at the expense of CIBA–GEIGY's APRESAZIDE products.

Illegal substitution occurs when the physician's prescription precludes generic substitution, and yet the pharmacist, without advising the patient, nevertheless dispenses a generic equivalent and charges the same price he normally charges for the brand name counterpart. The economic incentive for such conduct is provided by the fact that generic drugs are usually less expensive to purchase at wholesale than their brand name counterparts.

The court finds that duplication of APRESAZIDE's trade dress would facili-

tate illegal substitution. Patients will not be alerted to illegal substitution if the generic equivalent's trade dress is identical to that of the brand name counterpart.

It is difficult to envision how legitimate substitutions would be adversely affected by a difference in appearance. Either before or after the substitution is made the patient is entitled to and would normally receive an explanation. Most would be satisfied with that explanation. There is no evidence to support rejection by patients based upon a difference in appearance after such explanation.

Why then does the defendant insist upon duplicating the appearance of plaintiff's product? There is a good likelihood that it is because Bolar recognizes that such identity facilitates illegal substitution.

By deliberately copying APRESAZIDE's trade dress, not only did Bolar have reason to anticipate the passing off of its look-alike products for CIBA–GEIGY's APRESA-ZIDE products, but there is a substantial likelihood that plaintiff will succeed in proving that Bolar actually intended to facilitate such illegal substitution among pharmacists in order to increase its sales. To reach any other conclusion would ignore the realities of the situation. The court recognizes that such an indictment could logically extend to any generic manufacturer who produced a look-alike drug. The facts of this case however indicate that there is a likelihood that the identity of appearance was intended, at least in part, to promote illegal not legal substitution, since such identity is unnecessary to informed, legal substitution. Unfortunately the existence of illegal substitution has become all too prevalent.[9]

---

**9.** A total of 93 pharmacists and pharmacies in New York City, (27 in 1982 and 66 in 1980) have been criminally prosecuted and convicted for engaging in illegal substitution, while charges remain outstanding against another 61. The court takes judicial notice of these criminal convictions in this proceeding. *See* Fed.R.Evid. 201; *United States v. Alldredge,* 468 F.2d 684, 686 n.2 (3d Cir. 1972), *cert. denied sub nom. Martinez v. Alldredge,* 412 U.S. 920, 93 S.Ct. 2737, 37 L.Ed.2d 146 (1973); *Ruth v. First Nat'l*

*Bank,* 410 F.Supp. 1233, 1234 (D.N.J.1976). While in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* —— U.S. ——, 102 S.Ct. 2182, 2190 n.19, 72 L.Ed.2d 606 (1982), the Supreme Court recently expressed skepticism about the Second Circuit's taking judicial notice of indictments which "involved no convictions" and which were "not available when the district court rendered its decision", that is plainly not the situation here. Finally, there are cases in this circuit which have documented the exist-

### H. *Irreparable Harm and the Balance of Equities*

CIBA–GEIGY will sustain irreparable harm if preliminary injunctive relief is not granted. The balance of equities is in CIBA–GEIGY's favor.

Because illegal substitution is, by definition, undisclosed, CIBA–GEIGY will be unable to estimate accurately the full extent of its lost sales caused by Bolar's facilitation of this practice.

### I. *The Public Interest*

By facilitating illegal substitution, Bolar's conduct places APRESAZIDE patients in jeopardy. Doctors have a right to demand and expect that their specific instructions shall be carried out. Defendant's look-alike drug permits the doctor's instructions to be easily thwarted. The patient likewise has a right to expect that he or she will receive the exact medication prescribed. The existence of a look-alike drug deprives the patient of the sole means of learning that he or she is receiving a drug other than that prescribed. It may be unfair to the many ethical and honest pharmacists to predicate a rule of law upon an assumption that some pharmacists do and may illegally substitute generic drugs in order to make a greater profit. However, the evidence supports a finding that such practice is not uncommon and obviously may be more prevalent because of the inability to discover its extent.

Even in the case of legal substitution, Bolar's conduct endangers the public interest. If Bolar's products look confusingly similar to CIBA–GEIGY's, the patient may never learn or fully understand that they are not made by the same manufacturer as the products he had previously been taking—thereby jeopardizing his right to give his informed consent to the substitution.

A patient who has had a satisfactory experience with a drug may more readily agree to a generic substitute of the same appearance. At first blush, such conclusion may appear consistent with Bolar's arguments regarding functionality. However, such similarity may cause the patient to make the unwarranted assumption that the medication is identical and from the same manufacturer as the prior medication. In this area fraught with risks to health, no procedure should be condoned which affords to the patient anything less than all of the pertinent information and conditions which will prompt an inquiry for such information. There is no harm to the public in differentiating between the pills; there may be great harm in not.[10]

## CONCLUSIONS OF LAW

■ On the authority of the Third Circuit's decision in *SK&F, Co. v. Premo Pharmaceutical Laboratories, Inc.,* 625 F.2d 1055 (3d Cir. 1980), CIBA–GEIGY alleges that Bolar's intentional duplication of the trade dress of its APRESAZIDE products constitutes unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and two independent torts under New Jersey law: (a) the tort of "unprivileged imitation"; and (b) the tort of "passing off." The court has jurisdiction over CIBA–GEIGY's Lanham Act claims under 15 U.S.C. § 1121 and 28 U.S.C. § 1331(a) and over its

---

ence of illegal substitution. *See SK&F, Co. v. Premo Pharmaceutical Laboratories, Inc.,* 625 F.2d 1055, 1059 (3d Cir. 1980); *Hoffman La-Roche, Inc. v. Premo Pharmaceutical Laboratories, Inc.,* 210 U.S.P.Q. 374, 380 (D.N.J.1980); *Boehringer Ingelheim G.m.b.H. v. Pharmadyne Laboratories,* 532 F.Supp. 1040, 1059–60 & n.27 (D.N.J.1980).

**10.** The court recognizes its obligation to review the record and make findings and conclusions independent of the proposed findings of facts and conclusions of law submitted by the parties. The court has complied with that obligation. However, the court found it extremely difficult to improve upon many of the submissions of the plaintiff in this matter, and to a large extent has adopted same into its final opinion. The court trusts that the result will be recognized as a compliment to counsel's competence and thoroughness rather than any failing on the part of the court to consider fully and fairly all matters of fact and law presented to it.

After the initial reference to APRESAZIDE [R] and MINIPRESS [R], the court has dropped the "R" symbol for ease of typing only. No legal significance should be attributed thereto for any reason.

New Jersey unfair competition claims under 28 U.S.C. § 1338(b) and the principles of pendent jurisdiction. In order to establish its entitlement to a preliminary injunction against Bolar's conduct, CIBA–GEIGY must demonstrate a likelihood of ultimate success as to at least one of these two claims. In addition, CIBA–GEIGY must demonstrate that it is threatened with irreparable injury absent such relief; and that the balance of equities and the public interest favors such relief. Applying the following legal principles to the foregoing fact findings, the court concludes that CIBA–GEIGY has satisfied this burden.

### A. Likelihood of Ultimate Success

Bolar contends that CIBA–GEIGY has not met its burden with respect to either "unprivileged imitation" or "passing off" because, based upon Bolar's commercial labels and capsule markings, there is no likelihood that its generic hydralazine hydrochloride/hydrochlorothiazide combinations will be confused with CIBA–GEIGY's APRESAZIDE products. However, as recently reiterated in *Artus Corp. v. Nordic Co.,* 512 F.Supp. 1184, 1190–91 (W.D.Pa.1981):

> The test for customer confusion is not whether the products can be differentiated when subjected to a side-by-side comparison, but whether they create the same general overall impression. [citations omitted] . . . A dissimilarity in names will often prove ineffective in preventing confusion caused by the general similarity in appearance of the product.

Bolar's purported efforts to distinguish its product from plaintiff's are unsuccessful. The labels affixed by Bolar are not seen and the identification on the capsules cannot be seen. Furthermore, as noted in the court's findings of fact, on the one hand Bolar claims a readily apparent difference, and on the other hand urges that identity exists but is essential and justified.

The court concludes that neither Bolar's commercial labels nor the imprintations on its otherwise identical capsules are sufficient to prevent the likelihood of patients confusing Bolar's products with CIBA–GEIGY's. This is particularly so given the fact that most APRESAZIDE patients are over 60 years old. Here, as in *Boehringer Ingelheim G.m.b.H. v. Pharmadyne Laboratories,* 532 F.Supp. 1040, 1046 (D.N.J.1980), "[o]nly those with acute vision are likely to detect differences in logo, and a substantial number of [the drug's] users will not have sufficiently sharp eyesight." Having concluded that the record establishes a significant likelihood of confusion, the court next considers CIBA–GEIGY's chances of ultimate success with respect to the independent torts of unprivileged imitation and passing off.[11]

### 1. The Tort of Unprivileged Imitation

As Judge Gibbons stated in *SK&F,* the elements of the tort of unprivileged imitation "are generally expressed as conjunctive requirements of secondary meaning and nonfunctionality." 625 F.2d at 1063. In *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* —— U.S. ——, 102 S.Ct. 2182, 2186 n.10, 72 L.Ed.2d 606 (1982), the Supreme Court noted that "[i]n general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." Expanding on this notion in *SK&F,* the Third Circuit had stated:

> Proof of nonfunctionality generally requires a showing that the element of the product serves no purpose other than identification. In the case of a drug, for example, the allegedly nonfunctional element must not enhance efficacy.

625 F.2d at 1063. Subsequently, in *Keene Corp. v. Paraflex Indus., Inc.,* 653 F.2d 822, 825 (3d Cir. 1981), the Third Circuit framed the appropriate inquiry as "the extent to which the design feature is related to the utilitarian function of the product or feature."

---

11. As the Third Circuit noted in *SK&F,* except for the federal law's interstate commerce requirement, "the elements of the unfair competition torts proscribed by New Jersey law and by section 43(a) of the Lanham Act are the same...." 625 F.2d at 1066. And, here, the interstate commerce requirement is plainly satisfied.

When the design itself is not significantly related to the utilitarian function of the product, but is merely arbitrary, then it is entitled to protection as a design trademark if it has acquired the distinctiveness necessary to achieve secondary meaning. *Id.* Applying these principles to the facts of this case, the court concludes that the trade dress of each of CIBA–GEIGY's three APRESAZIDE products is nonfunctional.

■ In affirming the district court's nonfunctionality finding in *SK&F*, the Third Circuit emphasized that "[t]he adoption of [DYAZIDE<sup>R</sup>'s] trade dress was arbitrary, having nothing to do with the purpose or performance of the drug, or with its processing." 625 F.2d at 1064. This court has already indicated its finding that this is equally true with respect to the trade dress of APRESAZIDE. There was no medical, pharmaceutical or manufacturing reason that required CIBA–GEIGY to make its APRESAZIDE products in capsule rather than tablet form or in the particular colored capsules it selected. Nor was there any medical, pharmaceutical or manufacturing reason which compelled Bolar to copy the dosage form or color combinations chosen by CIBA–GEIGY.

■ The court rejects Bolar's contention that, because the three different color combinations of APRESAZIDE capsules serve to differentiate the capsules' three different strengths, their trade dress is functional. Rejecting a similar contention in *Ideal Toy Corp. v. Plawner Toy Manufacturing Corp.,* Civil No. 81–1431 (D.N.J. Oct. 21, 1981), *aff'd,* 685 F.2d 78, No. 81–3119 (3d Cir. July 26, 1982), this court stated:

> In the present instance, there are certainly numerous colors that could be used on the faces of the cube to differentiate them. In fact, it is not necessary to use solid colors at all.... The colors, of course, do serve a function. Some distinctive marks are necessary to differentiate the faces. But given the wide variety of possible marks, the actual colors and patches used are non-functional.

Slip Op. at 4. In *Biocraft Laboratories, Inc. v. Merck & Co.,* 532 F.Supp. 1068 (D.N.J.

1980), the court rejected the precise contention advanced by Bolar here. The fact that a manufacturer uses different colors to distinguish between its own products does not make those particular colors functional as to other manufacturers. If one strength is to be distinguished from another, any number and variety of colors or combinations thereof can be used. To suggest that the very same colors must be used is to defy common sense. Reid-Provident is presently marketing hydralazine hydrochloride/hydrochlorothiazide combination capsules which use different colors or shades to differentiate the products' three strengths but which do not duplicate the three color combinations of CIBA–GEIGY's APRESAZIDE capsules.

■ Bolar urges a number of other bases for concluding that CIBA–GEIGY's trade dress is functional. All of these contentions are predicated upon the claim that such trade dress is utilized for identification purposes. It is inconceivable that a physician or a pharmacist would prescribe a drug based upon its appearance only. Such appearance may be utilized as a secondary or incidental means of identification, but such use hardly rises to the level of functionality which would mandate or permit copying.

As previously stated, the court likewise rejects Bolar's contention that APRESAZIDE's trade dress is functional as a means for identification in poison control or overdose situations. There is no proof that APRESAZIDE is the type of drug which is likely to engender the kind of emergency room visits where such identification would become necessary. *Cf. Boehringer Ingelheim G.m.b.H.,* 532 F.Supp. at 1049. Moreover, Bolar's own expert pharmacist testified that a drug's trade dress would rarely, if ever, be relied upon as the sole means of identification in such situations because of the "plethora" of similar-appearing medications on the market. *See also SK&F, Co.,* 625 F.2d at 1060.

The court has also rejected Bolar's anxiety-functionality contention and the related contention that APRESAZIDE's trade dress is functional because patients already tak-

ing the CIBA–GEIGY products identify the drug's physical appearance with the medical condition (i.e., hypertension) for which they are prescribed, based upon the foregoing findings of fact.

Based upon the foregoing findings of fact certain conclusions are warranted:

1. Obviously if a patient has never taken a particular drug, no special reliance upon trade dress arises.

2. Therefore, the claim of functionality can only pertain in those instances where a patient has taken a particular medication over an extended period of time.

3. Assuming the medication is successful, the patient will associate this effect with the drug and recognize it as beneficial.

4. The patient will identify such medication as being associated with the illness for which it was originally prescribed.

5. The constancy of the trade dress will permit the patient to identify it with a single source, although not the particular source.

6. If a generic equivalent is recommended and accepted, the patient will be informed.

7. If the generic drug is different in appearance, the patient will be advised or understand that it is coming from a different source.

8. The patient may accept the generic drug or reject it for that very reason or any other reason.

9. If the generic drug is identical in appearance, the patient may never know that it derives from a different source.

10. The fully informed patient can easily adjust to a new color scheme.

11. The dissimilar medication affords to the physician, the pharmacist and the patient the opportunity to differentiate between the name brand and generic product and make an informed decision; the look-alike may deprive them of that opportunity.

Despite the evidentiary record on this motion, which demonstrates to the court's satisfaction that APRESAZIDE's trade dress is nonfunctional as a matter of fact, Bolar nevertheless contends that the court is precluded from so finding as a matter of law under the Supreme Court's opinion in *Ives Laboratories, Inc.* The narrow issue in *Ives* pertained to the scope of appellate review and whether the Second Circuit had correctly reversed the district court's holding that defendant's duplication of plaintiff's trade dress for its CYCLOSPASMOL [R] product did not amount to contributory trademark infringement in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114. In addressing that issue, the Supreme Court noted that "[w]hile the doctrine of functionality is most directly related to the question of whether a defendant has violated § 43(a) of the Lanham Act" (the statutory provision upon which CIBA–GEIGY relies here), "a finding of functionality may also be relevant to an action involving § 32" since it tends to indicate "a legitimate reason for producing an imitative product." 102 S.Ct. at 2190 n.20. In that context, the Supreme Court held in *Ives* that the Second Circuit had committed reversible error by finding a § 32 violation without first rejecting the district court's factual finding of functionality as "clearly erroneous." *Id.* The very fact that the Supreme Court's reversal rested squarely upon the Second Circuit's failure to comply with the "clearly erroneous standard" of Rule 52(a) of the Federal Rules of Civil Procedure which, by its terms, applies to "findings of fact," demonstrates that the Court was *not* ruling that drug trade dress is functional as a matter of law. The Court held that the Second Circuit could not "substitute its interpretation of the evidence for that of the trial court" without complying with Rule 52(a)'s standard. 102 S.Ct. at 2190. As Justice O'Connor stated:

> The appellate court was not entitled simply to disregard the District Court's finding of functionality.... If the Court of Appeals disagreed with the District Court's factual findings, it should not have dismissed them without finding them clearly erroneous.

*Id.* at 2190 n.20.[12]  Therefore, this court concludes that *Ives* does not overrule *SK&F* with respect to the nonfunctionality of drug trade dress, as Bolar contends.  Nothing in *Ives* precludes this court from evaluating the relevant evidence and concluding that the trade dress here in issue is nonfunctional.

The second element of CIBA–GEIGY's "unprivileged imitation" claim requires proof of secondary meaning.  In *Ives,* the Supreme Court observed that "[t]o establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself."  102 S.Ct. at 2186 n.11.  As the Third Circuit explained in *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1228 (3d Cir. 1978):

> Secondary meaning exists when the trademark [or trade dress] is interpreted by the consuming public to be not only an identification of the product, but also a representation of the product's origin. [citations omitted].  Secondary meaning is generally established through extensive advertising which creates in the mind of consumers an association between different products bearing the same mark. This association suggests that the products originate from a single source.

■  In order to establish secondary meaning it is unnecessary to prove that the public identifies the products' trade dress with the name of the products' manufacturer.  Indeed, such a requirement would render proof of secondary meaning virtually impossible in today's world since, as the Third Circuit has aptly recognized,

> owing to the ramifications of modern trade and international distribution of goods from the manufacturer to the jobber or importer and retailer to the consumer, the source or origin of the goods bearing a well-known trademark is seldom known to the consumer.

*Family Circle, Inc. v. Family Circle Associates, Inc.,* 332 F.2d 534, 539 (3d Cir. 1964).

Accordingly, the law is well settled that:

> ... to establish secondary meaning it is not necessary for the public to be aware of the name of the manufacturer which produces a product; rather, *it is sufficient if the public assumes that the product comes from a single though anonymous, source.*

*Processed Plastic Co. v. Warner Communications, Inc.,* 675 F.2d 852, 856 (7th Cir. 1982) (emphasis added).  Thus, it is no more necessary here for plaintiff to prove that APRESAZIDE patients identify those products with CIBA–GEIGY than it was for plaintiff to prove in *SK&F* that DYAZIDE [R] patients identified that product with SK&F.

■  A product is generally considered to have acquired distinctiveness and secondary meaning when its trade dress has been copied.  This rule is based on the theory that one only copies something of value and would not copy the trade dress of a product if it does not afford some commercial gain.  In determining whether a trademark or other symbol has acquired secondary meaning it is appropriate to consider the length and manner of its use and the nature and extent of advertising and promotions featuring the particular trade dress.

■  Secondary meaning can also be inferred by the court from the extensive sales of goods sold under the particular trade dress.

■  Applying these criteria to the facts, CIBA–GEIGY has demonstrated a strong likelihood of ultimate success on this element of its case.  *See Boehringer Ingelheim G.m.b.H. v. Pharmadyne Laboratories,* 532 F.Supp. at 1055–56, 1063–64.

■  The court also rejects Bolar's contention premised upon the market presence

---

**12.** Indeed, the Supreme Court did not even view the district court's factual finding of functionality in *Ives* as dispositive of plaintiff's § 43(a) claim, in which context such a finding is admittedly "directly" relevant.  Rather, be-

cause § 43(a) "prohibits a broader range of practices than does § 32," the Supreme Court remanded the case to the Second Circuit for an "independent review" of *Ives'* § 43(a) claim.  *Id.* at 2190.

of Pfizer's MINIPRESS capsules that CIBA–GEIGY's product is not entitled to secondary meaning. In order to acquire secondary meaning, a particular trade dress need not signify to all members of the consuming public that the product emanates from a single, exclusive source. As the First Circuit explained in *President & Trustees of Colby College v. Colby College—New Hampshire,* 508 F.2d 804, 807 (1st Cir. 1975):

> In order to find secondary meaning the district court required proof that "the name 'Colby College' ... exclusively signif[ies] the plaintiff institution in the mind of the public." [citations omitted.] Careful reading of both opinions suggests the court may have felt that exclusivity was lost if, to some persons, the name meant the wrong party. This is not so.... *There is sufficient secondary meaning as long as a significant quantity of the consuming public understand a name as referring exclusively to the appropriate party* .... (emphasis added).

Accordingly, the court concludes that the trade dress for APRESAZIDE's 25 mg./25 mg. and 50 mg./50 mg. capsules can achieve and has achieved secondary meaning among patients taking those products—the number of which is significant, despite the fact that patients taking MINIPRESS may associate the same color combinations with a different product and source. This conclusion is buttressed by the cases which have held that third-party use of a similar, if not identical trade dress or mark does not demonstrate a likelihood of confusion where, due to geographic barriers, distinct distribution channels, government regulations or the like, the probability is minimal that the consumers of plaintiff's products will ever be confronted with the third-parties' products. *See Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358, 364–65 (2d Cir. 1959); *National Lead Co. v. Wolfe,* 223 F.2d 195, 204 (9th Cir.), *cert. denied,* 350 U.S. 883, 76 S.Ct. 135, 100 L.Ed. 778 (1955); *David Crystal, Inc. v. Soo Valley Co.,* 471 F.2d 1245, 1246–47 (Cust. & Pat.App.1973); *Lever Brothers Co. v. American Bakeries Co.,* 537 F.Supp. 248, 254 (E.D.N.Y.1982);

*Central Bank & Trust Co. v. National Bank of Washington,* 187 U.S.P.Q. 651, 654 (D.D. C.1975); *Modular Cinemas of America, Inc. v. Mini Cinemas Corp.,* 348 F.Supp. 578, 583 (S.D.N.Y.1972). There is no real likelihood of APRESAZIDE patients ever being put in a position where they might confuse Pfizer's MINIPRESS products for their usual medication.

▮▮▮▮ With specific reference to Bolar's affirmative defense of genericism, namely that the association between APRESAZIDE's trade dress and the products' trade name cannot prove secondary meaning because APRESAZIDE is a common descriptive name for the product in suit, Bolar's burden is a "heavy" one, particularly where, as here, the name under challenge is a federally registered trademark which carries a presumption of validity. *E. I. DuPont de Nemours & Co. v. Yoshida International, Inc.,* 393 F.Supp. 502, 523 (E.D.N. Y.1975); *Coca-Cola Co. v. Pace,* 283 F.Supp. 291, 293 (W.D.Ky.1968). In the context of CIBA–GEIGY's preliminary injunction motion, Bolar must demonstrate a probability that it will ultimately succeed at trial in carrying the burden of this affirmative defense. The court concludes that Bolar has not so demonstrated. This is particularly so in light of Bolar's own, consistent use of hydralazine hydrochloride/hydrochlorothiazide as the generic name of the product in suit, which is strong evidence that APRESAZIDE has not become the generic appellation. *See Salton Inc. v. Cornwall Corp.,* 477 F.Supp. 975, 986 (D.N.J.1979). What more significant proof could there be than that the defendant, which is seeking to be a major competitor of the plaintiff, does not itself utilize plaintiff's brand name in a generic sense.

▮▮▮ Bolar has similarly failed to demonstrate the requisite likelihood of ultimate success on its affirmative defense of trademark abandonment—a defense which, as the Third Circuit has recently held, "must be strictly proved." *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 139 (3d Cir. 1981). Under the Lanham Act, 15 U.S.C. § 1127, a federally-registered trademark is deemed "abandoned":

(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

(b) When any course of conduct of the registrant, including acts of omission as well as commission, causes the mark to lose its significance as an indication of origin.

Proof of abandonment under subsection (a) embodies the "twin requirement of non-use and intent to abandon." *United States Jaycees*, 639 F.2d at 138. Measured against the criteria for determining whether these twin elements have been satisfied, see *id.* at 139, the court concludes that CIBA–GEIGY has not abandoned its APRESAZIDE trademark within the meaning of subsection (a). For the same reasons, Bolar has failed to demonstrate a likelihood of ultimate success on an affirmative defense of abandonment within the meaning of subsection (b). There is no persuasive evidence of conduct by CIBA–GEIGY constituting non-use of its APRESAZIDE trademark or an intent to abandon that mark; nor is there any proof of conduct by CIBA–GEIGY which has caused its APRESAZIDE trademark to lose its significance as an indication of origin.

The court concludes that CIBA–GEIGY has established the requisite likelihood of ultimate success on the elements of non-functionality and secondary meaning to support the issuance of a preliminary injunction on its claim of "unprivileged imitation" under § 43(a) of the Lanham Act and New Jersey law. Having so concluded, although it is unnecessary for the court to assess CIBA–GEIGY's likelihood of ultimate success on its independent claim of "passing off," the court will proceed to address it for the sake of completeness in the event of possible appellate review.

### 2. *The Tort of Passing Off*

In *SK&F*, what constituted illegal "passing off", under § 43(a) of the Lanham Act and New Jersey law was the facilitation by defendant, through its intentional imitation

of DYAZIDE's trade dress, of the "practice by some unscrupulous pharmacists of substituting less expensive generic drugs for the brand name drugs prescribed without informing their customers and without passing along the benefit of the lower price." 625 F.2d at 1063. As the Third Circuit explained:

[I]t has been held that it is actionable conduct under New Jersey law for a drug manufacturer to put a product in the hands of a pharmacist in a form which the manufacturer *can reasonably anticipate that it may be passed off as another product even if the manufacturer does nothing else to encourage passing off.*

*Id.* at 1062 (emphasis added). *Accord, e.g., Hoffman La Roche, Inc. v. Premo Pharmaceutical Laboratories, Inc.,* 210 U.S.P.Q. 374, 383 (D.N.J.1980); *Boehringer Ingelheim G.m.b.H. v. Pharmadyne Laboratories,* 538 F.Supp. at 1058–59 (D.N.J.1980).

█ The court concludes that Bolar, in copying APRESAZIDE's trade dress, reasonably anticipated that its look-alike capsules would be passed off by pharmacies as CIBA–GEIGY's APRESAZIDE products to a not insignificant degree. However, Bolar argues that the Supreme Court's decision in *Ives* "overruled" *SK&F*'s "reasonable anticipation" standard for the tort of passing off under § 43(a) of the Lanham Act.

The Supreme Court's reversal in *Ives* was limited to plaintiff's claim of contributory trademark infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114. Indeed, the Court remanded the case to the Second Circuit for an "independent review" of *Ives'* § 43(a) claim, because that provision "prohibits a broader range of practices than does § 32, as may the state unfair competition law . . . ." 102 S.Ct. at 2190. The key passage is contained in the concluding paragraph of Justice O'Connor's majority opinion, which reads as follows:

Although the District Court also dismissed Ives' claims alleging that the petitioners violated § 43(a) of the Lanham Act and the state unfair competition law, the Court of Appeals did not address those claims. Because § 43(a) prohibits a

broader range of practices than does § 32, as may the state unfair competition law, the District Court's decision dismissing *Ives'* claims based upon those statutes must be independently reviewed. Therefore, we remand to the Court of Appeals for further proceedings consistent with this opinion.

*Id.*

■ Accordingly, *Ives'* purported rejection of the "reasonable anticipation" standard was limited to § 32 claims of contributory trademark infringement, leaving unaffected, pending further review, the lower court decisions with respect to § 43(a)'s admittedly "broader" reach. Thus, *SK&F's* "reasonable anticipation" standard for the tort of passing off under § 43(a) remains the law in this circuit.

Section 43 outlaws a broader range of practices than does § 32. Citing Judge Hastie's "leading" opinion in *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649 (3d Cir. 1954), the Third Circuit in *SK&F* stated that "[i]t is well established that section 43(a) proscribes not only acts that would technically qualify as trademark infringement, but also unfair competitive practices involving actual or potential deception," including the tort of passing off. 625 F.2d at 1065. By putting in the hands of pharmacists, through intermediate wholesalers and distributors, a product which admittedly will facilitate illegal passing off, Bolar knowingly creates a real potential for deception, whether or not it is technically guilty of contributory trademark infringement.

■ Alternatively, even assuming that *SK&F's* "reasonable anticipation" standard does not survive *Ives,* CIBA–GEIGY has demonstrated a likelihood of success in establishing that Bolar copied its trade dress with the intention, at least in part, to induce or permit illegal substitution. This is the higher standard for contributory infringement championed by Justice White, 102 S.Ct. at 2192 (White, J., concurring) and the one which Bolar contends the *Ives* majority in fact adopted. In the context of this motion, it is unnecessary for CIBA–

GEIGY to satisfy its ultimate burden of proving such an intent. All that is required is proof of a likelihood of ultimate success on that issue. Based upon the court's findings of fact, the court concludes that CIBA–GEIGY has made such a showing. There is a substantial likelihood that CIBA–GEIGY will be successful in proving that although Bolar intended that its product would facilitate legal substitution, it also contemplated and intended that illegal substitution would take place as well.

In sum, applying either the "reasonable anticipation" or the actual "intent" standard, the court concludes that CIBA–GEIGY has established the requisite likelihood of success to support the issuance of a preliminary injunction on its independent claim of "passing off" under § 43(a) of the Lanham Act and New Jersey law.

**B.** *Irreparable Harm and the Balance of Equities*

Despite evidence of prosecution, and convictions, the extent of illegal substitution may never be known. Plaintiff's claim of irreparable injury is supported by defendant's anxiety theory. If patients will not be anxious because the generic product looks identical to the brand-name product, it is because the patient cannot and does not distinguish between them. Therefore, there would be no reason to complain since the patient will be unaware of the illegal substitution. Under such circumstances, the extent of such substitution can never be discovered, for the very reason that permitting the existence of an identical appearing product virtually destroys the ability to obtain satisfactory information.

The court concludes that it will be impossible for CIBA–GEIGY to calculate the full extent of any lost APRESAZIDE sales resulting from the illegal substitution facilitated by Bolar's conduct, since by definition such substitution will be undisclosed. This exacerbates the normally "difficult" problem of proving lost sales due to infringement.

In *SK&F,* the Third Circuit affirmed the district court's finding of threatened irreparable injury on the following ground:

> Unknowing or willful substitution [of Premo's product for DYAZIDE [R]] even if legally permissible would expose SKF not only to the risk of patient and physician dissatisfaction if the patient reacted to the substitute drug differently, but also to the risk of suit for the resulting consequences. In such a suit the striking similarity in appearance of the two products would make it unlikely that SKF, the deep pocket defendant, could prove that the harm was caused instead by Premo capsules, because the only proof as to the source would be the capsules long since digested by the patient.

625 F.2d at 1066.

The court is also obligated to balance the equities. It is difficult to envision what equities Bolar can assert. It knowingly copied plaintiff's product for the specific purpose of gaining an economic advantage thereby. It is or should be familiar with the law on this subject. Whatever actions it took, whatever expenses it incurred, it did so with full knowledge of the probable consequences. Its risks were known and calculated. Here, as in *SK&F,* Bolar's position "is almost totally devoid of equities." *Id.* As the court has already concluded, there was no functional reason which compelled Bolar to copy the trade dress of CIBA–GEIGY's products. Like Reid-Provident, Bolar could have begun marketing its hydralazine hydrochloride/hydrochlorothiazide combinations in March 1982 in differently colored capsules than APRESAZIDE, if not in tablet form, and achieved the same strong market position which it admits Reid-Provident has achieved.

#### C. *The Public Interest*

The primary basis for issuing an injunction in this matter, however, is protection of the public interest. Absent some harm or potential harm to the public, the courts might be more inclined to permit the parties to wage these battles in the marketplace rather than in the courts. However, this case presents a typical instance in which the court's edict is necessary to protect the public which stands unrepresented in this proceeding.

Stated in its most simple form the public will be harmed by the existence of defendant's product because it permits, if not encourages, illegal substitution. As the court has already noted in its findings of fact, such a determination is not meant to be a condemnation of all pharmacists or even a large portion thereof. But the facts support a finding that the practice exists, and therefore we must deal with the realities. There are laws against turning back mileage indicators on used cars, not because all dealers do it, but because some have and will.

The court concludes that the public interest will be served by the issuance of a preliminary injunction which, in effect, will prohibit the facilitation of illegal substitution. Certainly if such illegal substitution was intended, all the more reason why injunctive relief is appropriate.

Even in the case of legal substitution, Bolar's conduct endangers the public interest by jeopardizing the consumer's admitted right to sufficient information so that he can give informed consent to such substitution. If the physician has authorized the substitution without informing the patient, the patient will never know, if the generic is identical to the brand-name product previously administered. Even under these circumstances the court does not believe that the patient should be deprived of the opportunity of recognizing that a change has taken place. The look-alike drug deprives the patient of that opportunity. That Bolar's look-alike products may be chemically and therapeutically identical to CIBA–GEIGY's APRESAZIDE products does not obviate this threat to the public's right of informed consent. For as the Supreme Court has held:

> If consumers or dealers prefer to purchase a given article because it was made by a particular manufacturer or class of manufacturers, they have a right to do so, and this right cannot be satisfied by

imposing upon them an exactly similar article, or one equally as good, but having a different origin.

*F. T. C. v. Colgate-Palmolive Co.,* 380 U.S. 374, 388, 85 S.Ct. 1035, 1044, 13 L.Ed.2d 904 (1965), *quoting F. T. C. v. Royal Milling Co.,* 288 U.S. 212, 216, 53 S.Ct. 335, 336, 77 L.Ed. 706 (1933).

Finally, the court rejects Bolar's argument that the injunction sought by CIBA–GEIGY is "anticompetitive" in that it seeks to use the trademark laws to perpetuate an expired patent monopoly and thus stifle legitimate competition. This precise argument was made in *SK&F* and flatly rejected by the Third Circuit. *See* 625 F.2d at 1064–65, 1067.

### CONCLUSION

The court holds that CIBA–GEIGY has demonstrated its right to a preliminary injunction against Bolar's duplication of the trade dress of CIBA–GEIGY's APRESA-ZIDE products and an order will be entered to that effect.